UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
Texarkana Division

| | | |
|---|---|---|
| AGILIS BENEFIT SERVICES LLC, | ) | |
| DALE K. EDWARDS, | ) | |
| H. DAVID WRIGHT, and | ) | |
| ADELINE V. PIPER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.: 5:08-CV-00213 DF-CMC |
| | ) | |
| TRAVELERS CASUALTY AND | ) | |
| SURETY COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT TRAVELERS' MOTION FOR
## SUMMARY JUDGMENT AND SUPPORTING BRIEF

Defendant, Travelers Casualty and Surety Company of America ("Travelers"),
moves under Rule 56 of the Federal Rules of Civil Procedure for summary judgment in
its favor on all claims asserted by Plaintiffs, Agilis Benefit Services LLC, Dale K.
Edwards, H. David Wright, and Adelene V. Piper.  In accordance with Local Rules CV-7
and CV-56, Travelers submits its supporting brief and summary judgment evidence with
this Motion.

## I.      STATEMENT OF THE ISSUES

The central issue in this action is whether Travelers has an obligation, under
Insuring Agreement I.B.1. of the D&O policy in dispute (the "Policy"), to reimburse
Plaintiff Agilis Benefit Services LLC ("Agilis") for the attorneys' fees and expenses
Plaintiffs Edwards, Wright and Piper (collectively, the "Directors and Officers")[1]

---

[1] Travelers refers in this Brief to Agilis and the Directors and Officers, collectively, as the
"Insureds."

purportedly incurred in "defending" themselves against a federal government investigation.  To be clear, this case does not involve a claim for reimbursement of any attorneys' fees and expenses *Agilis* may have incurred in connection with the investigation.  Rather, it only involves Agilis's claim for reimbursement of the attorneys' fees and expenses it allegedly paid on behalf of the Directors and Officers as indemnification.

To resolve the central issue, the Court must first decide the following:

1.      Whether a "Claim," as the Policy defines that term, has been made against the Directors and Officers.

2.      If a "Claim" has been made against the Directors and Officers, whether that Claim is "for 'Wrongful Acts.'"

3.      If a "Claim" has been made against the Directors and Officers "for 'Wrongful Acts,'" whether the Policy's Professional Services Exclusion excludes such Claim from coverage.

If the Court were to find that no Claim has been made against the Directors and Officers or that no "Wrongful Acts" have been alleged, then Travelers would be entitled to judgment as a matter of law on all claims, and there would be no need for the Court even to reach the third question.

If, however, the Court were to find that a "Claim" for "Wrongful Acts" has been made against the Directors and Officers, and that the Professional Services Exclusion does not apply, then the parties (by agreement and with the Court's approval) would move on to Phase II of this case.  During Phase II, the parties would have the opportunity to conduct discovery on, and proceed to litigate, any remaining issues and claims.

For the reasons discussed in this Brief, however, there <u>is no</u> coverage under the Policy, Travelers <u>is</u> entitled to judgment as a matter of law on all claims, and Phase II discovery will therefore be unnecessary.

## II.    SUMMARY OF ARGUMENT

The threshold question in this insurance coverage dispute is unusually straightforward and, from Travelers' perspective, very easily answered in the negative: has a "Claim" been made against the Directors and Officers?  In their Complaint, the Insureds identify the purported Claim as a government investigation into possible tax-related offenses.[2]  Because that investigation, indisputably, is (or was) *criminal* in nature, the only part of the Policy's "Claim" definition that can possibly be implicated— assuming Texas's canons of contract construction are heeded—is the third part, defining "Claim" as "a criminal proceeding commenced by return of an indictment."  Because no indictment has been returned against the Directors and Officers, there is no "Claim" under the Policy and, therefore, the attorneys' fees and expenses they purportedly incurred in "defending" the investigation are ineligible for coverage.

Even if the Court were to ignore the indictment requirement, the Insureds would still have to establish the existence of a Claim against the Directors and Officers "for Wrongful Acts."  Given the constraints of Texas's "eight corners" rule—which forbids the use of materials extraneous to the underlying pleadings in determining whether there is a duty to defend—this is something the Insureds cannot do.  There are no underlying pleadings in this case—only a handful of documents allegedly incident to the government investigation:  a document subpoena served on Agilis in Texas; a search warrant executed

---

[2] The Insureds do not say, and may not know, whether the investigation is still ongoing.

at Agilis's office in the Virgin Islands; the application for that search warrant (whose supporting affidavit is missing); and a search warrant (whose application and its supporting affidavit are also both missing) executed at a Virgin Islands bank where Agilis maintained one or more safety deposit boxes.  Those documents, however, only identified the books and records Agilis was commanded to produce to the grand jury, and the items to be seized by federal law enforcement officials in the Virgin Islands.  They did not accuse any Insured of any "Wrongful Acts" and, therefore, are insufficient to trigger the Policy's coverage.

Before filing this lawsuit, the Insureds sent Travelers an additional search warrant they said had been executed at the offices of the South Carolina law firm at the center of the government investigation.  The Insureds claimed that search warrant includes allegations of wrongdoing by the Directors and Officers and, thus, shows the investigation constitutes a "Claim" against them.  The search warrant served on the law firm is, however, extraneous to the investigative documents served on Agilis and, therefore, may not be considered when the Court analyzes whether Travelers has a duty to defend.  Even if it could be considered, however, that search warrant—in particular, the supporting affidavit—establishes as a matter of law that, even if the criminal investigation were a "Claim" (which it is not), the Policy's broad Professional Services Exclusion would bar coverage and, thus, relieve Travelers of any duty to defend.

### III.     STATEMENT OF UNDISPUTED FACTS

A.     The Policy

1.     Travelers issued Private Company Directors and Officers Liability PLUS+$^{SM}$ Policy No. 104468715 to Agilis for the Policy Period April 18, 2006 to April

18, 2008.  (<u>See</u> Affidavit of Kelly A. Kihlmire-Caudill, Esq. ("Kihlmire-Caudill Aff."), ¶ 3; Ex. 1 to Kihlmire-Caudill Aff. at 20, ITEM 2)

     2.     The Policy has a $1 million maximum aggregate Limit of Liability for all Claims.  (Ex. 1 to Kihlmire-Caudill Aff. at 20, ITEM 3)  Each Claim falling under Insuring Agreement I.B.1. or Insuring Agreement I.B.2. is subject to a $25,000 Retention. (<u>Id.</u> at 20, ITEM 5)

     3.     Under the Policy, Travelers has the right and duty to defend any Claim, even if such Claim is groundless, false or fraudulent.  (Ex. 1 to Kihlmire-Caudill Aff. at 10, § VIII. A.)

     4.     The Policy's Insuring Agreements, which are expressly subject to all of the Policy's terms, conditions and limitations, provide as follows:

     I.     <u>Insuring Agreements</u>

     A.     [Travelers] shall pay on behalf of the Insured Persons Loss resulting from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts except for Loss which the Insured Organization pays to or on behalf of the Insured Persons as indemnification.

     B.     [Travelers] shall pay on behalf of the Insured Organization:

     1.  Loss resulting from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts which the Insured Organization pays to or on behalf of the Insured Persons as indemnification; and

     2.  Loss resulting from Claims first made during the Policy Period against the Insured Organization for Wrongful Acts.

(Ex. 1 to Kihlmire-Caudill Aff. at 5, § I.)

     5.     The Policy defines "Claim" to mean:

     1.     a written demand for monetary or non-monetary relief;

2.      a civil proceeding commenced by service of a complaint or similar proceeding;

3.      <u>a criminal proceeding commenced by return of an indictment</u>; or

4.      a formal administrative or regulatory proceeding, including but not limited to proceedings brought by or before the Equal Employment Opportunity Commission ("EEOC") or similar state or local agency, commenced by the filing of a notice of charges, formal investigative order or similar document;

<u>against an Insured for a Wrongful Act</u>.

A Claim shall be deemed to have been made on the date of service upon or receipt of notice by any Insured of the written demand or proceeding, whichever occurs earlier.

(Ex. 1 to Kihlmire-Caudill Aff. at 5, § II. A. (Emphasis added))[3]

6.      The Policy defines "Loss" to mean, among other things, "Defense Expenses . . . judgments, settlements or other amounts that an Insured is obligated to pay as a result of a Claim."  (Ex. 1 to Kihlmire-Caudill Aff. at 6, § II. I.)

7.      Under the Policy, the "Insureds" are the "Insured Persons" and the "Insured Organization."  (Ex. 1 to Kihlmire-Caudill Aff. at 6, § II. F.)  The "Insured Persons" include "any one or more past, present or future duly elected or appointed directors or officers, or members of the Board of Managers, of the Insured Organization." (<u>Id.</u> at 6, § II. H.)  The "Insured Organization" includes Agilis (the "Parent Corporation") and any "Subsidiary."  (<u>Id.</u> at 6, §§ II. G., II. L.; <u>id.</u> at 20, ITEM 1)

8.      Under the Policy, the term "Wrongful Act" means, among other things:

1.      any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, . . . , by an Insured Person

---

[3]   Although the Insureds quote a portion of the "Claim" definition in their Complaint, they conspicuously omit the third part of the definition applicable to criminal proceedings.

> in his or her capacity as a director or officer of the Insured Organization;
>
> 2.      any matter asserted against an Insured Person solely by reason of his or her status as a director or officer of the Insured Organization; . . . .

(Ex. 1 to Kihlmire-Caudill Aff. at 6, § II. S.)

9.      The Policy is subject to the following "BROAD GENERAL PROFESSIONAL ERRORS AND OMISSIONS EXCLUSION" (the "Professional Services Exclusion"):

> In consideration of the payment of the premium, [Travelers] shall not be liable for Loss, including Defense Expenses, resulting from any Claim made against any Insured based upon, alleging, arising out of, directly or indirectly resulting from, or in any way relating to any actual or alleged act, error or omission by any Insured with respect to the rendering of, or failure to render professional services for any party.

* * *

(Ex. 1 to Kihlmire-Caudill Aff. at 19)

B.      The Subpoena And The Search Warrants

10.      In their Complaint, the Insureds allege that Agilis is a part of a group of "affiliated companies" that developed and now license certain proprietary and patent-pending products, which licenses allow the licensees to provide benefit plans to executives.  (Compl., ¶ 9)  The licenses allegedly are sold to clients who are separately and independently represented by qualified advisors, such as attorneys and accountants, and sold through independent financial planners who provide financial planning services to companies or executives.  (Id.)

11.      According to the Complaint, on July 18, 2007, Agilis was served with a document subpoena issued by an Assistant United States Attorney for the District of

South Carolina pursuant to a federal grand jury investigation (the "Subpoena"). (Compl., ¶ 20)  Although the Insureds did not attach the Subpoena to their Complaint, they previously sent Travelers a copy. (See Kihlmire-Caudill Aff., ¶ 7; Ex. 5 to Kihlmire-Caudill Aff.)

12.     The Subpoena did not allege any wrongdoing on the part of any Insured. (See generally Ex. 5 to Kihlmire-Caudill Aff.)  Rather, the Subpoena only commanded Agilis to produce various financial, banking, loan and customer records for the years 2001- 2007. (Id. at 2-4)  Among other things, the Subpoena stated that questions regarding the Subpoena should be directed to "Special Agent Thomas R. Oenbrink, IRS-CID, Charleston." (Id. at 1)

13.     Also on July 18, 2007, the Criminal Investigative Division of the Internal Revenue Service ("IRS-CID") allegedly executed a search warrant at the United States Virgin Islands offices of Agilis and two other entities (the "Search Warrant"). (Compl., ¶ 21)  Although the Insureds did not attach the Search Warrant or the Application for the Search Warrant (the "Application") to the Complaint, they previously sent Travelers copies of those documents.[4] (See Kihlmire-Caudill Aff., ¶ 7; Exs. 6, 7 to Kihlmire-Caudill Aff.)

14.     The Search Warrant indicates that it was issued by the United States District Court for the District of the Virgin Islands upon the Affidavit of Special Agent Thomas R. Oenbrink. (Ex. 6 to Kihlmire-Caudill Aff. at 1)

_____

[4] The Search Warrant also authorized the search of the Virgin Islands offices of two other companies, Professional Holding Company and Executive Benefit Group.  Neither is part of the "Insured Organization," so the Directors and Officers have no claim for coverage under the Policy for any attorneys' fees or expenses they may have incurred, or may in the future incur, related to any investigation of, or claim against, either of those entities, or against them in their capacities as officials of those entities.

15.     Thomas R. Oenbronk, a Special Agent with the IRS-CID, signed the Application,[5] which states that the IRS-CID had reason to believe there was concealed at Agilis's offices in St. Croix evidence, contraband or property used or intended to be used in committing a criminal offense, specifically, violations of 26 U.S.C. §§ 7212 and 7201 and 18 U.S.C. § 371.  (Ex. 7 to Kihlmire-Caudill Aff. at 1)

16.     The Application indicates that the facts supporting a finding of probable cause were set forth in the Affidavit of Thomas R. Oenbronk, and that Mr. Oenbronk's Affidavit was attached to the Application.  (Ex. 7 to Kihlmire-Caudill Aff. at 1)  The Application does not include Mr. Oenbronk's Affidavit, however, and Agilis has failed to provide that Affidavit to Travelers despite repeated requests.  (See Affidavit of Michael J. Rosen, Esq. ("Rosen Aff."),  ¶¶ 4-6)

17.     According to the Complaint, the IRS-CID also executed a search warrant at "safety deposit and lock boxes under the control of Edwards, Wright and Piper" (the "Bank Search Warrant").  (Compl., ¶ 21)  Although the Insureds did not attach the Bank Search Warrant to its Complaint, they previously sent Travelers a copy.  (See Kihlmire-Caudill Aff., ¶ 8; Ex. 8 to Kihlmire-Caudill Aff.)

18.     The Bank Search Warrant was issued by the United States District Court for the District of the Virgin Islands upon the Affidavit of Michael J. Harriman, and it was to be executed at The Virgin Islands Community Bank, Christiansted, St. Croix. (Ex. 8 to Kihlmire-Caudill Aff. at 1)  Despite repeated requests, the Insureds have never provided Travelers the application for the Bank Search Warrant or Mr. Harriman's Affidavit, and neither document is attached to the Complaint.  (See Rosen Aff., ¶¶ 4-6)

---

[5] Presumably, Special Agent Thomas R. Oenbrink and Special Agent Thomas R. Oenbronk are one and the same person.

19.     Allegedly, the Directors and Officers promptly retained counsel "to defend themselves against the government investigation," and Agilis allegedly has indemnified the Directors and Officers for the more than $1 million in attorneys' fees and expenses they say they incurred "in defending themselves against the government investigation." (Compl., ¶¶ 27, 29, 30)  Although the Directors and Officers allegedly retained counsel specializing in criminal defense nearly two years ago, and Agilis allegedly paid that counsel over $1 million, neither Agilis nor the Directors and Officers have ever tendered to Travelers counsel's billing invoices, despite repeated requests.

C.     <u>Travelers' Declination of Coverage</u>

20.     On August 10, 2007, Defendant Edwards sent Travelers a letter purporting to provide notice of a Claim under the Policy.  (See Kihlmire-Caudill Aff., ¶ 4; Ex. 2 to Kihlmire-Caudill Aff.)  Mr. Edwards' letter states (in part):

On July 18, 2007 the Company was served with a subpoena for documents issued by an Assistant U.S. Attorney for the District of South Carolina pursuant to a Federal Grand Jury investigation.  On that same date, Search Warrants were issued and executed by the Internal Revenue Service Criminal Investigative Division in Frederiksted, St. Croix, United States Virgin Islands.  Personal property belonging to the Company and business entities affiliated with the Company was seized during the execution of those Warrants.  On July 19, 2007, the Company and executives of the Company were informed, through their outside counsel, that they were targets of a criminal investigation being conducted by the U.S. Department of Justice relating to the business activities of the Company.

In addition to the Company, individuals so far named include Dale K. Edwards, H. David Wright, and Adelene V. Piper.  The nature of the investigation involves tax matters, and thus the individuals named above have retained attorneys specializing in white collar defense matters with an emphasis on criminal tax matters.  [. . .]

 Please acknowledge receipt of this notice along with a listing of any other information that you may require.  [. . .]

21.    On August 15, 2007, Travelers acknowledged its receipt of Mr. Edwards'

August 10, 2007 letter, asked for any additional information that might assist in

determining whether there was coverage, and reserved all of its rights, remedies and

defenses under the Policy.   (See Kihlmire-Caudill Aff., ¶ 5; Ex. 3 to Kihlmire-Caudill

Aff.)  Travelers received no response to its acknowledgment letter.  (Kihlmire-Caudill

Aff., ¶5)

22.    On October 5, 2007, Travelers denied coverage on the ground that no

"Claim" had been made against any Insured.  (See Kihlmire-Caudill Aff., ¶ 6; Ex. 4 to

Kihlmire-Caudill Aff.)   In its declination letter, Travelers asked to be informed

immediately if the investigation resulted in an indictment of any Insured.  (Ex. 4 to

Kihlmire-Caudill Aff. at 2)  Travelers concluded its letter by again fully reserving all of

its rights, remedies and defenses under the Policy, and by noting, among other things, that

neither the letter nor any action by Travelers should be construed as a waiver of any of

Travelers' rights or defenses.  (Id.)

23.    By letter dated November 15, 2007, Travelers reiterated its position that

the matter did not meet the Policy's definition of "Claim."  (See Kihlmire-Caudill Aff., ¶

9; Ex. 9 to Kihlmire-Caudill Aff. at 3)  In addition, Travelers noted that the Subpoena did

not allege any "Wrongful Acts," as the Insuring Agreements require, and that, in any

event, the Professional Services Exclusion eliminated coverage.  (Ex. 9 to Kihlmire-

Caudill Aff. at 3)  Travelers concluded its November 15, 2007 letter by once again fully

reserving all of its rights, remedies and defenses under the Policy and applicable law.

(Id.)

24.     Over the course of the next year or so, Travelers and the Insureds' counsel exchanged a number of letters explaining their divergent views on coverage.  During that time, the Insureds' counsel provided Travelers a redacted affidavit (the "Dutton Affidavit") the Insureds said had been filed in support of applications for search warrants on the offices of O'Connor, Kachmarsky & Taylor, a South Carolina law firm.  (See Rosen Aff., ¶ 3; Ex. 1 to Rosen Aff.)

25.     Although Travelers reviewed that information, it never retracted its coverage denial or waived *any* of it rights and defenses under the Policy and applicable law.  (See Rosen Aff., ¶ 7)  This coverage litigation ensued.

## IV.     LEGAL STANDARDS

A.     Summary Judgment

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). For purposes of summary judgment, a fact is "material" if, under applicable substantive law, its resolution is critical to the outcome of the suit, and a dispute is "genuine" if, based on the evidence, a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-250 (1986); First Colony Life Ins. Co. v. Sanford, 555 F.3d 177, 181 (5th Cir. 2009).  Although reasonable inferences are to be drawn in favor of the non-moving party, that party must do more than show "some metaphysical doubt as to the material facts."  Meinecke v. H & R Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  Indeed, an opponent of summary judgment must "set

forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." <u>Boudreaux v. Swift Transp. Co.</u>, 402 F.3d 536, 540 (5th Cir. 2005). Conclusory allegations, improbable inferences, and unsupported speculation are *not* sufficient to defeat a motion for summary judgment. <u>Id.</u>; <u>Brown v. City of Houston, Tex.</u>, 337 F.3d 539, 541 (5th Cir. 2003).

B.     <u>Contract Interpretation and Burden of Proof</u>

Under Texas law—which the Insureds presumably will agree governs in this dispute—insurance policies are subject to the same rules of interpretation that apply to contracts generally. <u>Potomac Ins. Co. of Ill. v. Jayhawk Med. Acceptance Corp.</u>, 198 F.3d 548, 550 (5th Cir. 2000); <u>Progressive County Mut. Ins. Co. v. Sink</u>, 107 S.W.3d 547, 551 (Tex. 2003).  In construing a written contract, the court's primary purpose is to ascertain the parties' intent as expressed in the written instrument. <u>Gregg & Valby, L.L.P. v. Great Am. Ins. Co.</u>, 316 F. Supp. 2d 505, 508 (S.D. Tex. 2004); <u>State Farm Life Ins. Co. v. Beaston</u>, 907 S.W.2d 430, 433 (Tex. 1995).  To that end, the court "reads all provisions within the contract as a whole and gives effect to each term so that no part of the agreement is left without meaning." <u>Gregg & Valby</u>, 316 F. Supp. 2d at 508.  The words used in a contract are to be given their plain, ordinary and generally accepted meanings unless the contracting parties chose to replace those meanings with particularized definitions, which are to be given effect. <u>Id.</u> at 508-09; <u>Western Reserve Life Ins. Co. v. Meadows</u>, 261 S.W.2d 554, 557 (Tex. 1953).  The construction of an insurance policy, like other written contracts, is a question of law for the court to decide. <u>Gregg & Valby</u>, 316 F. Supp. 2d at 508; <u>Beaston</u>, 907 S.W.2d at 433.

In Texas, the insured bears the initial burden of establishing the existence of coverage, while the insurer bears the burden of establishing the applicability of an exclusion.  Gregg & Valby, 316 F. Supp. 2d at 508; Venture Encoding Serv., Inc. v. Atlantic Mut. Ins. Co., 107 S.W.3d 729, 733 (Tex. App. -- Ft. Worth 2003, pet. denied).

C.      Duty to Defend

Texas follows the "eight corners" rule for determining whether an insurer has a duty to defend.  Allstate Ins. Co. v. Disability Servs. of the Southwest, Inc., 400 F.3d 260, 263 (5th Cir. 2005); King v. Dallas Fire Ins. Co., 85 S.W.3d 185, 187 (Tex. 2002). Under this rule, the court is to examine the "four corners" of the policy and the "four corners" of the underlying complaint and then decide whether the factual allegations state a cause of action falling, or potentially falling, within the scope of coverage.  Disability Services, 400 F.3d at 263.  Resort to evidence outside these "eight corners" is generally prohibited.  Liberty Mut. Ins. Co. v. Graham, 473 F.3d 596, 599-600 (5th Cir. 2006); GuideOne Elite Ins. Co. v. Fielder Road Baptist Church, 197 S.W.3d 305, 308 (Tex. 2006).  While courts are to read the allegations in a pleading liberally and in favor of the duty to defend, courts "'may not read facts into the pleadings, may not look outside the pleadings, and may not 'imagine factual scenarios which might trigger coverage.'"  St. Paul Fire & Marine Ins. Co. v. Green Tree Fin. Corp.-Tex., 249 F.3d 389, 394 (5th Cir. 2001) (quoting St. Paul Ins. Co. v. Texas Dep't of Transp., 999 S.W.2d 881, 885 (Tex. App.-- Austin 1999, pet. denied) and National Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines, Inc., 939 S.W.2d 139, 142 (Tex. 1997)).

## V.   <u>ARGUMENT</u>

A.   <u>Travelers Is Entitled To Summary Judgment Because No "Claim" Has Been Made Against The Directors and Officers</u>

In their Complaint, the Insureds allege that Agilis has indemnified the over $1 million in attorneys' fees and costs the Directors and Officers allegedly incurred "in defending themselves against the government investigation."  (Compl. ¶¶ 29-30)  The Insureds further allege that Travelers breached its obligations under the Policy by failing to "timely and reasonably pay" those attorneys' fees and costs.  (<u>Id.</u> ¶ 43).  Agilis, then, is seeking benefits under Insuring Agreement I.B.1., which provides as follows:

> [Travelers] shall pay on behalf of the Insured Organization:
>
> Loss resulting from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts which the Insured Organization pays to or on behalf of the Insured Persons as indemnification; . . . .

(Ex. 1 to Kihlmire-Caudill Aff. at 5, § I.)

Coverage under this Insuring Agreement can only attach if the Insureds can show a "Claim" was first made during the Policy Period against Insured Persons for Wrongful Acts.  The Policy defines "Claim" to mean

1.   a written demand for monetary or non-monetary relief;

2.   a civil proceeding commenced by service of a complaint or similar proceeding;

3.   a criminal proceeding commenced by return of an indictment; or

4.   a formal administrative or regulatory proceeding, including but not limited to proceedings brought by or before the Equal Employment Opportunity Commission ("EEOC") or similar state or local agency, commenced by the filing of a notice of charges, formal investigative order or similar document;

against an Insured for a Wrongful Act.

(Ex. 1 to Kihlmire-Caudill Aff. at 5, § II. A.)  Under this definition, the Policy covers written demands for relief, and three distinct types of proceedings—civil proceedings, criminal proceedings, and formal administrative or regulatory proceedings—each commenced in a different way.  In the context of criminal proceedings, a "Claim" is commenced solely by the return of an indictment—a limitation that manifests the contracting parties' intent that, in the criminal context, the Policy would cover only *post-indictment* Loss.

The government investigation for which Agilis is seeking coverage is (or was) criminal in nature.  To be sure, a federal grand jury is a creature of the Federal Rules of *Criminal* Procedure.  See Fed. R. Crim. P. 6.  As the Supreme Court has explained, "[t]he grand jury occupies a unique role in our *criminal* justice system.  It is an investigatory body charged with the responsibility of determining whether or not a *crime* has been committed."  United States v. R. Enterprises, Inc., 498 U.S. 292, 297 (1991) (emphasis added).  Thus, the grand jury Subpoena served on Agilis was necessarily served in aid of a federal *criminal* investigation.  In addition, the Search Warrant and the Bank Search Warrant permitted federal law enforcement officers to search for evidence of a *crime* or for property used or intended to be used in the commission of a *crime.*  See Fed. R. Crim. P. 41.  The Search Warrant, in particular, authorized agents of the *Criminal Investigative Division* of the Internal Revenue Service to search for and seize "evidence, contraband or property used or intended to be used as the means of committing a *criminal* offense

concerning violations of [26 U.S.C. §§ 7201 and 7712 and 18 U.S.C. § 371]."[6]  (Ex. 6 to Kihlmire-Caudill Aff.; Ex. 7 to Kihlmire-Caudill Aff. at 1) (emphasis added.)  In light of the evidence and their own allegations, the Insureds cannot deny the government investigation is (or was) a *criminal* proceeding.

The Policy, however, unambiguously requires the return of an indictment as a prerequisite to coverage for criminal proceedings.  Under Texas contract interpretation principles, that requirement *must* be enforced.  <u>See</u> <u>Calpetco 1981 v. Marshall</u> <u>Exploration, Inc.</u>, 989 F.2d 1408, 1413 (5th Cir. 1993) (noting the "basic rule of contract interpretation" that "every clause is intended to have some effect").  Here, because no indictment has been returned against any of the Directors and Officers, the Insureds cannot meet their threshold burden of establishing the existence of a "Claim" against them.  Notably, just last year, the United States District Court for the Southern District of New York dismissed a coverage action under Rule 12(b)(6) because the insured's complaint did not allege that the underlying grand jury investigation had resulted in the return of an indictment, as the subject policy's "claim" definition required.  <u>Diamond</u> <u>Glass Cos., Inc. v. Twin City Fire Ins. Co.</u>, No. 06-CV-13105(BSJ)(AJP), 2008 WL 4613170, *3 (S.D.N.Y. Aug. 18, 2008).  In reaching that decision, the court refused to interpret the policy the way the insured advocated because, to do so, "would read the phrase 'commenced by an indictment' right out of the [p]olicy."  <u>Id.</u> at *3 n.4.  Under

---

[6] As the Complaint alleges, 28 U.S.C. § 7201 imposes criminal penalties in anyone who willfully attempts, "in any manner," to evade or defeat any tax imposed by the Internal Revenue Code.  (Compl., ¶ 23)  26 U.S.C. § 7212 imposes criminal penalties on anyone who in any way "corruptly . . . obstructs or impedes, or endeavors to obstruct or impede the due administration of" the Internal Revenue Code.  (<u>Id.</u> at ¶ 24)  18 U.S.C. § 371 imposes criminal penalties on anyone who conspires to commit any offense against the United States or to defraud any federal agency.  (<u>Id.</u> at ¶ 25)

settled principles of contract construction, the indictment requirement must be enforced in this case as well.

Agilis, therefore, is not entitled to Policy benefits under Insuring Agreement I.B.1. (or any other Insuring Agreement), and Travelers is entitled to summary judgment on *all* of Plaintiffs' claims.  This case really is as simple as that, and it should end here.

B.     Travelers Is Entitled To Summary Judgment Because The Insureds Cannot Establish A Claim Has Been Made Against The Directors and Officers "For Wrongful Acts"

Even if the Court were to ignore the indictment requirement, the Insureds would still have to establish the existence of a Claim against the Directors and Officers *"for Wrongful Acts"* before Agilis could recover under Insuring Agreement I.B.1.[7]  Absent an allegation of one or more "Wrongful Acts" within the four corners of the purported Claim, Travelers has no duty to defend.

Under the Policy, "Wrongful Act" means, among other things:

> 1.     any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, . . . , by an Insured Person in his or her capacity as a director or officer of the Insured Organization;

> 2.     any matter asserted against an Insured Person solely by reason of his or her status as a director or officer of the Insured Organization; . . . .

(Ex. 1 to Kihlmire-Caudill Aff. at 6, § II. S.)

---

[7] The inclusion of the words "against an Insured for a Wrongful Act" in the Policy's "Claim" definition buttresses this requirement.  (Ex. 1 to Kihlmire-Caudill Aff. at 5, § II. A.)  These words show that, in order for a demand or a proceeding (of any type) to qualify as a "Claim," the demand or proceeding *must* contain express allegations of wrongdoing by an Insured.  A document (like the Subpoena, the Search Warrant and the Bank Search Warrant) that contains mere requests for information from—but makes no allegations of wrongdoing against—an Insured cannot be a "Claim" and, thus, cannot trigger the Policy's coverage.

The Insureds have not tendered to Travelers any pleading naming any Insured as a defendant or alleging any "Wrongful Acts."  All they have tendered are the Subpoena served on Agilis in Texas, the Search Warrant executed at Agilis's St. Croix office, and the Bank Search Warrant executed at Agilis's St. Croix bank.  The Subpoena, however, only described the books and records Agilis was commanded to produce to the grand jury, and the Search Warrant and the Bank Search Warrant only listed the items to be seized from Agilis by federal law enforcement officials in the Virgin Islands.  Although the Search Warrant and the Bank Search Warrant identified the Directors and Officers—and dozens of other individuals, entities, and bank accounts—as "Parties of Interest"—neither alleged any Insured had committed any "Wrongful Acts."  While the Oenbronk Affidavit and the Harriman Affidavit—filed in support of the Search Warrant and the Bank Search Warrant, respectively—may have contained allegations of wrongdoing, those documents are not in the record and, under Texas law, it would be improper for the Court to speculate or imagine what they might have said.  Green Tree, 249 F.3d at 394 (cautioning that courts "may not read facts into the pleadings, may not look outside the pleadings, and may not 'imagine factual scenarios which might trigger coverage.'").

Notably, before filing this lawsuit, the Insureds sent Travelers various materials relating to search warrants the Insureds said were executed in July 2007, at the offices of O'Connor, Kachmarsky & Taylor, the South Carolina law firm at the center of the grand jury's probe.  (See Rosen Aff., ¶ 3; Ex. 1 to Rosen Aff.)  Those materials included the Dutton Affidavit filed in support of the applications for those search warrants.  (Ex. 1 to Rosen Aff. at 1-57)  The Dutton Affidavit contains an extensive description of the various alleged tax-related crimes the IRS-CID was investigating, and it outlines the

alleged involvement of the Directors and Officers—and  various entities they allegedly controlled—in those crimes.  (Id.)

The search warrants served on the O'Connor law firm, including their corresponding applications and the Dutton Affidavit, are, however, extraneous to the investigative documents served on Agilis.  Therefore, the Court may *not* consider those search warrants in determining whether Travelers has a duty to defend the Directors and Officers.  See Green Tree, 249 F.3d at 391 (noting that, in Texas, an insurer's duty to defend must be determined solely from the face of the pleadings, without reference to any facts outside the pleadings).  It would be a clear violation of the eight corners rule for the Court to do so—unless the Insureds could prove the Dutton Affidavit was also used to support the applications filed in the Virgin Islands court to obtain the Search Warrant and Bank Search Warrant.[8]

In short, the Insureds have the burden of proving the basic requirements for coverage under Insuring Agreement I.B.1., but they cannot point to even a single "Wrongful Act" alleged within the four corners of the documents they say embody the "Claim" here.  For this additional (and alternative) reason, Travelers is entitled to judgment as a matter of law on all claims.

---

[8] This does not appear possible, given that the Search Warrant and the Bank Search Warrant state they were issued in reliance upon the Affidavits of Thomas Oenbronk and Michael Harriman, respectively.  Moreover, the Dutton Affidavit indicates that a *separate* application containing different or expanded allegations was filed in the Virgin Islands. (Ex. 1 to Rosen Aff. at 17, ¶ 34)

C.    Travelers Is Entitled To Summary Judgment Because The Dutton Affidavit—If The Court Were To Deem It Proper Summary Judgment Evidence—Shows The Professional Services Exclusion Would Apply To The Purported "Claim"

Even if the Court were willing to ignore the constraints of the eight corners rule and speculate that the same allegations in the Dutton Affidavit were made against the Insureds to procure the Search Warrant and the Bank Search Warrant, Travelers would still be entitled to summary judgment because those allegations trigger the Professional Services Exclusion.  That provision reads:

> . . . [Travelers] shall not be liable for Loss, including Defense Expenses, resulting from any Claim made against any Insured based upon, alleging, arising out of, directly or indirectly resulting from, or in any way relating to any actual or alleged act, error or omission by any Insured with respect to the rendering of, or failure to render professional services for any party.
>
> * * *

(Ex. 1 to Kihlmire-Caudill Aff. at 19)

The Dutton Affidavit outlines an alleged criminal scheme among several parties to create, market and facilitate a complicated tax shelter—known as "ExTRA" or "VExTRA"—designed to take improper advantage of the United States Virgin Islands' favorable tax rates.  (Ex. 1 to Rosen Aff. at 3, ¶ 5; id. at 6-7, ¶¶ 10(k)-(l); id. at 9, ¶ 19)[9] According to the Dutton Affidavit, there were at least five key participants in the alleged scheme:

1.    The O'Connor law firm, which allegedly promoted the tax shelter program to prospective "clients."  (Ex. 1 to Rosen Aff. at 15, ¶ 29)

2.    AKA Benefit Consultants ("AKA").   Allegedly, a taxpayer's initial payment to AKA was purportedly in consideration of "management

---

[9] According to the Dutton Affidavit, ExTRA and VExTRA were the same plan.  (Ex. 1 to Rosen Aff. at 15, ¶ 29)  "VExTRA" was  simply the name used when the O'Connor firm promoted the plan to clients.  (Id.)

services" provided to the taxpayer's S or C Corporation, and, therefore, the taxpayer would take a deduction for the amount of that investment. According to the Dutton Affidavit, however, AKA was merely a shell company whose only purpose was to pass along the "management services" payments as "license fees" to the owner of the ExTRA product. (Ex. 1 to Rosen Aff. at 15-19, ¶¶ 30-37)

3.      Professional Holding Company, LLC ("PHC").  PHC allegedly owned the intellectual property known as ExTRA, which was the "product" allegedly marketed by the O'Connor firm.  A participant in the program would contribute cash via a disbursement from his or her S or C Corporation, which was then funneled by an independent shell corporation to PHC in exchange for a "license" to use the ExTRA product.  (Ex. 1 to Rosen Aff. at 17, ¶ 34; id. at 27, ¶ 42(l))

4.      Executive Benefit Group ("EBG").  EBG was alleged to be a financing company whose purpose was to support the ExTRA program by making "loans" on clients' behalves to shell United States Virgin Islands LLCs ("USVI LLCs") that were created on a client-by-client basis.  The amounts of the "loans" would roughly equal the amounts of the initial client "investment" or "license fee," less fees charged by the various entities at each step of the process.  (Ex. 1 to Rosen Aff. at 17-18, ¶¶ 34-37)

5.      Agilis.  Agilis was alleged to be a financial planning and insurance general agent that would procure life insurance for the USVI LLCs on behalf of the taxpayer.  (Ex. 1 to Rosen Aff. at 17, ¶ 34(d); id. at 28, ¶ 43(e))  The life insurance policies quickly accumulated a cash value equal to the initial investment, which would then be funneled back to the taxpayer as a tax-free policy loan.  (Id. at 16, ¶ 33)

The allegations in the Dutton Affidavit are lengthy and complex, but those involving the Directors and Officers, and the various entities they allegedly controlled, may fairly be summarized as follows.  ExTRA was a plan designed to allow a taxpayer to divert income earned in the United States to the United States Virgin Islands ("USVI"). (Ex. 1 to Rosen Aff. at 15, ¶ 30)  As part of the plan, the taxpayer allegedly would establish a USVI investment limited liability company he or she controlled.  (Id. at 16, ¶ 33)  The LLC would then purchase life insurance policies sold by Agilis, which policies would immediately accumulate cash value.  (Id.)  The taxpayer would then take a non-

taxable loan against the policy's accumulated cash value.  (Id.)  Allegedly, Agilis and other entities controlled by the Directors and Officers were intricately involved in this series of transactions.  (Id. at 17, ¶ 34)  Indeed, the Directors and Officers, operating as Agilis, PHC and EBG, allegedly would retain 5.5% of the taxpayer client's "investment" in the LLC as fees, and funnel the remainder to the LLC.  (Id. at 19, ¶ 37)  Agilis would also collect a 25% commission on the insurance policies it placed for taxpayers participating in the plan.  (Ex. 1 to Rosen Aff. at 29, ¶ 43(h))

The Dutton Affidavit identifies Wright was the "mastermind" behind the scheme. (Ex. 1 to Rosen Aff. at 28, ¶ 43(b))  Allegedly, Wright constructed all the models and ran all the analyses for the plan.  (Id.)  Piper allegedly handled the underwriting and insurance aspects of the plan.  (Id.)  Edwards, Wright, and Piper allegedly controlled the ExTRA/VExTRA entities operating as Agilis, PHC and EBG.  (Ex. 1 to Rosen Aff. at 17, ¶ 34(b)-(d))  According to the Dutton Affidavit, Edwards described the various entities (to an undercover agent) as follows:

> Think of Agilis and PHC in the following way[:]  PHC is the organization that builds and owns ExTRA, and owns a financing company underneath it called [EBG] that finances ExTRA.  [. . .] Then there is Agilis separate from that and Agilis is the financial planning and insurance general agency, which is [Wright], [Piper] and I.  *We are responsible for designing these things on a client-by-client basis.*
>
> * * *
>
> So as part of that journey *we began to build and develop a technique* that we call in its most basic form a capital asset transfer technique.  The common term you hear us refer to is ExTRA.
>
> * * *
>
> Okay. So you're licensed and you get paid commissions based on product result.  Okay?  And the answer is very simple.  *We—*

> *[Piper, Wright] and I—put this whole thing together.* Okay?  And for that, one of the things we get is we get 25% of the commission of the life insurance policy.  That's how we get paid.

(Ex. 1 to Rosen Aff. at 28-29, ¶¶ 43(e)-(f), (h)) (emphasis added).

In sum, the Dutton Affidavit depicts the Directors and Officers as the key players in the ExTRA/VExTRA scheme.  It was they who allegedly created the tax-avoidance technique, and it was they, or the companies they allegedly controlled, who profited from its use by procuring the insurance policies integral to implementing the plan.

Whether the Professional Services Exclusion would apply here—and, correspondingly, whether Travelers has duty to defend—depends on whether the government investigation—the purported "Claim"—was an investigation "based upon, alleging, arising out of, directly or indirectly resulting from, or in any way relating to any actual or alleged act, error or omission by any Insured with respect to the rendering of, or failure to render professional services for any party."  More particularly, coverage turns on whether the Insureds' development of the ExTRA plan or their selling of life insurance policies to facilitate the plan constitutes "the rendering of professional services."

Although the Policy does not define "professional services," Texas courts have given the term meaning.  To be a "professional service" under Texas law, a "task must arise out of acts particular to the individual's specialized vocation."  <u>Atlantic Lloyds Ins. Co. of Texas v. Susman Godfrey, L.L.P.</u>, 982 S.W.2d 472, 476-77 (Tex. App. -- Dallas 1998, pet. denied); <u>Jayhawk</u>, 198 F.3d at 552.  An act is not necessarily a "professional service" simply because a professional performs it.  <u>Susman Godfrey</u>, 982 S.W.2d at 476-77; <u>Jayhawk</u>, 198 F.3d at 552.  Rather, for an act to qualify as a "professional service," it

"must be necessary for the professional to use his or her specialized knowledge or training." <u>Susman Godfrey</u>, 982 S.W.2d at 476-77; <u>Jayhawk</u>, 198 F.3d at 552; <u>Gregg & Valby,</u> 316 F. Supp. 2d at 513.  Furthermore, ordinary or administrative acts can qualify as "professional services" if they are vital to the core business of the professional. <u>Certain Underwriters at Lloyd's, London v. Amwest Fin., Inc.</u>, No. H-04-4024, 2005 WL 1994290, *7 (S.D. Tex. 2005) (citing <u>Disability Services</u>, 400 F.3d at 264).[10]

At issue in <u>Amwest</u> was the declination of coverage by a mortgage broker's insurer on grounds that the broker's alleged activities constituted professional services, which the subject policy excluded.  In the underlying lawsuit, the insured was alleged to have participated in a scheme (with mortgage companies and others) to sell homes to unsophisticated buyers at artificially inflated prices, and then to pass on the inherently risky loans to other mortgage lenders by misrepresenting the true value of the properties collateralizing the loans.  2005 WL 1994290, at *2.  The acts the insured allegedly undertook—all to "create the impression of value" in furtherance of the scheme— included:  gathering borrower credit information; taking loan applications; preparing good faith estimates; and soliciting services from appraisers, insurance agents, and title companies.  <u>Id.</u> at *7.  Ultimately, the court concluded all these acts were "professional services" because they were necessary for the loans to close.  <u>Id.</u> at **7-8.  They were

[10] In <u>Disability Services</u>, the liability insurer of a 24-hour home healthcare provider sought a declaratory judgment that it had no duty to defend or indemnify a wrongful death suit brought by the family of one of the insured's former patients. 400 F.3d at 261-62.  Allegedly, shortly after entering into the insured's care, the patient contracted an infection but could not ask for medical assistance because there were no communications devices accessible to him.  <u>Id.</u>  Unable to reach anyone, the patient died.  <u>Id.</u>  In the coverage action, the Fifth Circuit held for the insurer, concluding both that communicating with patients is "vital" and "integral" to providing "health" or "nursing" services, and that the family's wrongful death claim was "inseparable" from the insured's alleged failure to provide usable communication devices to the patient.  <u>Id.</u> at 264.

not, the court explained, merely the actions "of a scribe filling out forms at the direction of someone else, but instead constituted the core functions of [the insured's] business." Id. at *8.  Accepting for the sake of argument the insured had done nothing illegal, the court still ruled the professional services exclusion applied (and negated any duty to defend) because the acts alleged "were all in [the insured's] capacity as a mortgage broker," and because the insured's "specialized services and knowledge" lay "at the heart of the alleged scheme."  Id.

Here, the Dutton Affidavit alleges that one or more of the Directors and Officers designed ExTRA—a complicated tax-avoidance scheme marketed to executives.  Very obviously, the Directors and Officers *had* to have used their specialized knowledge as financial planners and insurance agents in designing that scheme.  Indeed, to set up the complex sequence of transactions required to implement the plan, they *had* to have had more than a passing familiarity with the tax laws in the United States and in the United States Virgin Islands.  Edwards even admitted (perhaps unwittingly) that the Insureds were rendering "professional services," when he told an undercover agent that the Directors and Officers were "responsible for designing these things on a client-by-client basis." (Ex. 1 to Rosen Aff. at 28, ¶ 43(e))  In addition, the Dutton Affidavit alleges that Agilis served as an insurance broker for plan participants, procuring—for a commission—the life insurance policies necessary to the ExTRA plan's full implementation.  (Id. at 17, ¶ 34(d); id. at 29, ¶ 43(h))  There can be no doubt that procuring an insurance policy by an insurance broker constitutes a "professional service"—indeed, procuring insurance is the sine qua non of what insurance brokers do.

Regardless, then, of whether the government investigation culminates in indictments of the Directors and Officers–in which event there finally would be a "Claim"—the acts described in the Dutton Affidavit show that Claim would fall within the broad language of the Professional Services Exclusion (as would the investigation, if it were a Claim).  Indeed, the specialized knowledge and services the Insureds allegedly provided were central to the scheme under investigation.  Consequently, regardless of whether that scheme was legal or illegal, the Insureds can have no claim for coverage.

## VI.  CONCLUSION

For these reasons, Travelers respectfully requests the Court to enter summary judgment for Travelers on all of the Insureds' claims.

April 23, 2009                                      Respectfully submitted,


                                                    /s/ Kelly Tidwell_____
                                                    Kelly B. Tidwell, Esq. (Texas Bar No. 20020580)
                                                    PATTON TIDWELL & SCHROEDER, L.L.P.
                                                    4605 Texas Boulevard (75503)
                                                    P.O. Box 5398
                                                    Texarkana, TX  75505-5398
                                                    Telephone: (903) 792-7080
                                                    Facsimile:  (903) 792-8233

                                                    and

                                                    Peter F. Lovato, III, Esq. (Illinois Bar No. 1695940)
                                                    Michael J. Rosen, Esq. (Illinois Bar No. 6193177)
                                                    BOUNDAS, SKARZYNSKI, WALSH & BLACK, LLC
                                                    200 East Randolph Drive, Suite 7200
                                                    Chicago, IL  60601
                                                    Telephone:  (312) 946-4200
                                                    Facsimile:  (312) 946-4272

                                                    Attorneys for Defendant,
                                                    Travelers Casualty and Surety Company of America

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this motion was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Fed.R.Civ.P.5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy via facsimile and/or U.S. First Class Mail this 23rd day of April, 2009.

*/s/ Kelly Tidwell*_____
Kelly Tidwell

4841-8610-3043